### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **ANITA GINSKI, individually and on behalf of similarly situated individuals**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ETHOS SEAFOOD GROUP, LLC, a Delaware limited liability company, SEAFOOD GROCERY GROUP, INC., a California corporation, and SANTA MONICA SEAFOOD COMPANY, a California corporation,**<br><br>**Defendants**. | Case No. 1:23-cv-16402<br><br>Judge Mary M. Rowland |

### MEMORANDUM OPINION & ORDER

Plaintiff Anita Ginski has sued Defendants Ethos Seafood Group, LLC., Seafood Grocery Group, Inc., and Santa Monica Seafood Company (collectively, "Defendants") under the Illinois Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1, *et seq.* Before the Court is Defendants' motion to compel Ginski to arbitrate, or, in the alternative, to dismiss her complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 17). For the reasons stated herein, Defendants' motion is denied.

### BACKGROUND

Ginski applied for a job with Defendants in or around December of 2020. (Dkt. 29, Ex. A ¶ 29). During the hiring process and as a precondition of employment, Ginski alleges that Defendants required her to undergo a physical examination. (Dkt.

29, Ex. A ¶ 30). As a part of the examination, Defendants required her to answer questions concerning her medical history, including whether any members of her family had a history of high blood pressure, cancer, diabetes, heart disease, and other medical conditions. (Dkt. 29, Ex. A ¶ 31). Ginski provided the information, and she was not at any point advised by Defendants that she was not required to disclose the solicited information. (Dkt. 29, Ex. A ¶¶ 32, 34). Ginski was hired by Defendants and worked at the Santa Monica Seafood Company until February 17, 2021, when she voluntarily quit. (Dkt. 18, Ex. 1 ¶ 3).

Ginski filed this lawsuit, on behalf of herself and similarly situated individuals who applied for employment with Defendants in Illinois and from whom Defendants requested family medical history, in the Circuit Court of Cook County in November 2023. (Dkt. 29, Ex. A ¶ 36). She alleges that Defendants violated GIPA by soliciting information regarding the manifestation of diseases in family members of prospective employees. (Dkt. 29, Ex. A ¶ 26). On November 30, 2023, Defendants removed the case to this Court. (Dkt. 1).

Relevant to Defendants' motion to compel arbitration, at the time of her employment, Ginski was given access to the Santa Monica Seafood Company Employee Handbook (the "Santa Monica Handbook" or "Handbook"). (Dkt. 18, Ex. 1 ¶ 4).

On its second page, under a subheading entitled "USE OF THE EMPLOYEE HANDBOOK," the Handbook states:

> The Company, as it deems appropriate in its sole and absolute discretion, reserves the right to revise, supplement or rescind any of the

2

provisions, policies, procedures, benefits and rules in this Employee Handbook, other than the policies regarding At Will Employment and Mutual Arbitration of Disputes. If changes are made, a new written policy will be issued and will prevail. All existing employees are required to execute an Employee Acknowledgment Form and Agreement to At Will Employment and Mutual Mandatory Arbitration of Disputes after receipt and review of this Employee Handbook. All new employees are required to execute this same Employee Acknowledgment Form prior to beginning work with the Company. No oral statements or representations can in any way change or alter the provisions of this Employee Handbook. This Employee Handbook is not an employment contract and is not intended to create a promise or representation of continued employment for any employee. This Employee Handbook supersedes all prior oral and/or written policies, procedures, rules, regulations, commitments and practices of the Company

(Dkt. 30, Ex. B at 2). The Handbook includes a policy entitled "MUTUAL ARBITRATION OF DISPUTES" (the "MAD") that states in relevant part:

**Please Read Carefully:** To the fullest extent allowed by law, any controversy, claim or dispute between you and the Company (and/or any of its owners, directors, officers, employees, volunteers or agents) relating to or arising out of your employment or the cessation of your employment with the Company will be submitted to final and binding arbitration as the exclusive remedy for such controversy, claim or dispute . . . BY AGREEING TO THIS MUTUAL AND BINDING ARBITRATION PROVISION, BOTH YOU AND COMPANY GIVE UP ALL RIGHTS TO TRIAL BY JURY.

(Dkt. 18, Ex. 1, Att. A at 31) (emphasis in original). Defendants purport to have provided a copy of Ginski's signed acknowledgment of Handbook and its policies to the Court. (Dkt. 18, Ex. 1 ¶ 5). However, the copy Defendants provided does not contain a signature from either Ginski or from any of Defendants' human resource representatives (*see* Dkt. 18, Ex. 1, Att. B).

Before the Court is Defendants' motion to compel arbitration, or alternatively, to dismiss. (Dkt. 17).

3

## DISCUSSION

### 1. Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), "[a] written provision in … a contract… to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and places "arbitration agreements on an equal footing with other contracts." *Gore v. Alltel Comm'cns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotations omitted). It thereby follows that parties are not required to arbitrate unless they have agreed to do so. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974). "When deciding whether parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Rest., Inc. v. Steak N Shake Enterp., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014). The Court may consider exhibits and affidavits regarding the arbitration agreement. *Friends for Health: Supporting North Shore Health Center v. PayPal, Inc.,* No. 17 C 1542, 2018 WL 2933608, at *3 (N.D. Ill. June 12, 2018).

### a. The Parties Do Not Have an Enforceable Arbitration Agreement

A party seeking to compel arbitration must first establish that an enforceable arbitration agreement exists. *Gen. Ass'n of Regular Baptist Churches v. Scott*, 549 F. App'x. 531, 533 (7th Cir. 2013). Whether an agreement to arbitrate has been formed

is governed by state contract law. *Gore,* 666 F.3d at 1032. Under Illinois[1] law, for a valid contract to exist, there must be an offer, an acceptance, and consideration. *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006). The Illinois Supreme Court has held that an employee handbook or policy statement can create an enforceable contract when the following elements are satisfied:

> First, the language of the [handbook or policy statement] must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the [handbook or policy statement] must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the [handbook or policy statement].

*Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987).

At issue here is whether either the Santa Monica Handbook or the MAD contained within it satisfy *Duldulao*'s first and second elements such that the parties are bound to arbitrate. The Court finds that Defendants have satisfied the first element, but not the second, and thus that no enforceable arbitration agreement exists between the parties.

First, the parties dispute whether the disclaimer in the Santa Monica Handbook precludes the Handbook from constituting an offer under *Duldulao*'s first element. "[S]ince *Duldulao*, [courts] have wrestled with whether disclaimers contained within the respective employee handbooks are sufficient to negate the promises made. Decisions both ways have been rendered." *Long v. Tazewell/Pekin Consol. Commc'n Ctr.*, 574 N.E.2d 1191, 1193 (Ill. App. Ct. 1991).

---

[1] In their memoranda, both parties agree that the law of Illinois, where Ginski was employed, governs the question of contract formation. As a result, the Court does not need to do a choice-of-law analysis. *Dental Experts, LLC v. Massachusetts Bay Ins. Co.*, 536 F. Supp. 3d 318, 322 (N.D. Ill. 2021)

5

Plaintiffs rely on *Bradley*, where the court held that an arbitration agreement contained in an employee handbook was not enforceable because the handbook contained disclaimers stating neither it nor its contents functioned as a contract. *Bradley v. Wolf Retail Sols. I, Inc.*, 443 F. Supp. 3d 959, 960-61 (N.D. Ill. 2019). The *Bradley* handbook contained four disclaimers in total – it stated "that 'it is not a contract of employment,' that '[n]othing in this Handbook . . . is . . . intended to create contractual obligations of any kind,' and twice, in bold, that '[t]his Employee Handbook is not a contract.'" *Bradley*, F. Supp. 3d at 961-62. The *Bradley* court held that it "is axiomatic that a document that it is not a contract and that it creates no contractual obligations of any kind is not a contract that creates a contractual obligation to engage in arbitration." *Id.* at 962. The handbook also contained a provision relating to dispute resolutions, which stated:

> All employees of the Company agree to first seek to mediate any dispute with the Company with a mediator from the American Arbitration Association or similar organization trained and experienced in employment disputes. If mediation is not successful, both the Company and the employee agree to submit their dispute to arbitration.

*Id.* at 960.

By comparison, the Santa Monica Handbook contains just one disclaimer stating that "[t]his Employee Handbook is not an employment contract and is not intended to create a promise or representation of continued employment for any employee." (Dkt. 30, Ex. B at 2). Notably, the Santa Monica Handbook does *not* say that it creates *no* contractual obligations, only that it *is not a contract of employment*. *Id.* Also, the MAD policy contained within the Santa Monica Handbook goes much

6

further in creating a binding promise than the *Bradley* handbook does. The Santa Monica Handbook states "[t]o the fullest extent allowed by law, any controversy, claim or dispute between you and the Company . . . will be submitted to final and binding arbitration as the exclusive remedy," and "BY AGREEING TO THIS MUTUAL AND BINDING ARBITRATION PROVISION, BOTH YOU AND THE COMPANY GIVE UP ALL RIGHTS TO TRIAL BY JURY." (Dkt. 18, Ex. 1, Att. A) (emphasis in original).

The language in the Santa Monica Handbook and MAD is more similar to that of *Moreno*. There, the court found an arbitration agreement enforceable despite appearing in an employee handbook which generally disclaimed that it was "not a binding contract." *Moreno v. Progistics Distribution, Inc.*, No. 18 C 1833, 2018 WL 3659348, at *4 (N.D. Ill. Aug. 2, 2018). The *Moreno* handbook separately contained an "Arbitration Policy" section with its own bolded heading that bound the parties to arbitrate any employment-related disputes. *Id*. at *1, *4. The *Moreno* court reasoned that "general, prefatory disclaimers in an employee handbook 'do not preclude a ruling compelling an employee to arbitrate.'" *Id*. at *6 (quoting *Diggs v. Linebarger, Goggan Blair & Sampson, LLP*, No. 13 C 624, 2013 WL 5737306, at *2 (N.D. Ill. Oct. 22, 2013)); *see also Campbell v. Nw. Mem'l Home Health Care/Servs., Inc.*, No. 97 C 7693, 1998 WL 246403, at *7 (N.D. Ill. Apr. 30, 1998) (Disclaimers in an employee handbook "will not override language that purports to establish enforceable rights in unequivocal terms.").

The Court finds that the language in the MAD is sufficient to overcome the general disclaimer that the Handbook. Unlike *Bradley*, nothing in the Handbook states that it creates no contractual obligations of any kind, only that it is not a contract of employment. Further unlike *Bradley*, the policy relating to dispute resolutions in the Handbook clearly binds both parties and does not allow for claims or controversies to be heard by a court of law.

Plaintiffs insist that "the *handbook* does not create any contractual obligations," (Dkt. 29 at 4 (emphasis added)), but this misses the point. *Duldulao* is clear that ". . . an employee handbook *or other policy statement* creates enforceable contractual rights" when the requirements for contract formation are met. 505 N.E.2d at 318 (emphasis added). And as *Moreno* and *Campbell* make clear, the mere fact that the Santa Monica Handbook disclaims that it is not a "contract of employment" does not render null other provisions of the Handbook that create contractual obligations. The language in the MAD is clear that it binds both parties to arbitrate any disputes that arise out of an employee's employment. Because the language in the MAD contains a clear, binding promise, the parties would be bound to arbitrate if the other *Duldulao* elements were satisfied.

But despite that clear language in the MAD, the Court nonetheless finds the agreement unenforceable because Defendants cannot demonstrate that the MAD was "disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believe[ed] it to be an offer," as *Duldulao*'s second element requires. 505 N.E.2d at 318.

8

Illinois case law regarding what is necessary to satisfy this element is very limited, but at least one court has found that simply making policies available to employees is not sufficient. *Koch v. Illinois Power Co.*, 529 N.E.2d 281, 287 (Ill. App. Ct. 1988). Additionally, the Seventh Circuit declined to find that *Duldulao*'s second element was satisfied when a handbook was not "generally distributed," even if an employee "was aware of its contents." *Morgan v. Harris Tr. & Sav. Bank of Chicago*, 867 F.2d 1023, 1029 (7th Cir. 1989). Another court held that an employer's "method of disseminat[ing]" an arbitration policy statement failed *Duldulao*'s dissemination prong because the employee was not "provided notice of the . . . arbitration provision." *Niebrugge v. King's Med. Grp., Inc.*, No. 08-1018, 2008 WL 2980034, at *3 (C.D. Ill. July 31, 2008) (interpreting Illinois law). *See Porter v. Kraft Foods Glob., Inc.*, 2012 IL App (4th) 120258-U, ¶ 33 (employer satisfied dissemination prong by actually disseminating the policy statement at issue to employees and requiring employees to sign an acknowledgment reflecting the substance of the policy).

Defendants here have failed to satisfy *Duldulao*'s second requirement regardless of the standard set. Defendants point to language in both the Santa Monica Handbook and the MAD that directs employees to read carefully as evidence that they can satisfy *Duldulao*'s second element. (Dkt. 32 at 4). But any directions contained within the Handbook are evidence of the Handbook's contents, not its manner of dissemination. And Defendants cite to no authority suggesting that such language is sufficient to meet their obligation.

Defendants further argue that Ginski "sign[ed] an acknowledgement of the policies, including the "'MUTUAL ARBITRATION OF DISPUTES' POLICY." (Dkt. 32 at 5 (quoting Dkt. 18, Ex. 1 at ¶ 15)). Citing to *Davis v. Fenton*, Defendants claim that Ginksi's signature "presumptively establishes that she read and agreed to the terms of the contract." (Dkt. 32 at 5). But in *Davis*, the parties signed an agreement stating that they "read and understood the foregoing terms and agree to them." 26 F. Supp. 3d 727, 738 (N.D. Ill. 2014). Here, the acknowledgement that Ginski purportedly signed nowhere states that she acknowledges any policies, nor that she agrees to be bound by any of them. (*See* Dkt. 18, Ex. 1, Att. B). It states only that the Handbook is "available for all employees" and that its latest version "is readily available when [an employee] want[s] to access it." *Id*. It's not clear from this acknowledgement that Ginski read or even *received* the Handbook or the policies it contains, only that it was *available* to her. As a result, Defendants fail to satisfy *Duldulao*'s second element. *Koch*, 529 N.E.2d at 287 (placing a policy in a handbook to which employees have access is not a sufficient form of dissemination).

But Defendants have an even bigger problem. They have not offered uncontroverted evidence that Ginski ever signed the acknowledgement. Defendants' director of human resources, Victor Santillan, attested that all employees "are required to familiarize themselves with the Handbook and to sign an acknowledgement of the policies, including the "MUTUAL ARBITRATION OF DISPUTES" policy." (Dkt. 18, Ex. 1 at ¶ 5). The director further attested that "Ms. Ginski electronically signed this Acknowledgement," and attached a copy of Ginski's

signed acknowledgement to his affidavit. (*Id*.) Curiously, however, the acknowledgement Mr. Santillan attached is not signed by Ginski. (*See* Dkt. 18, Ex. 1, Att. B). Indeed, the signature field is blank. (*Id*.) So too is the field where the Court presumes a human resource representative was meant to sign indicating that the employee had reviewed the Handbook. (*Id*.) And as discussed, the form that Mr. Santillan describes as "an acknowledgement of the policies" is simply not that – it is an acknowledgement that the Handbook is *available* to employees.

Likening the standard under a motion to compel arbitration to a motion for summary judgment, Defendants argue that because Ginski has not contested Mr. Santillan's attestation, the Court should deem the facts contained therein admitted. (Dkt. 32 at 5). But in a motion for summary judgment, the moving party "has the burden of establishing uncontroverted facts to support its motion." *Koclanakis v. Merrimack Mut. Fire Ins. Co.*, 899 F.2d 673, 675 (7th Cir. 1990). Defendants fail to establish uncontrovertibly that Ginski signed an acknowledgement of any policies because they attached a clearly unsigned acknowledgement form to Mr. Santillan's affidavit. *See Herman v. Dodson*, No. 10-CV-564-MJR-SCW, 2012 WL 2119812, at *4 (S.D. Ill. June 11, 2012) (finding that a party's own self-contradictory evidence can create a genuine issue of material fact).

In a motion to compel arbitration, the Court draws "all justifiable inferences in [the non-movant's] favor". *Aucutt v. Pioneer Restaurants, LLC*, No. 3:24-CV-00091-GCS, 2024 WL 1906629, at *2 (S.D. Ill. May 1, 2024). Defendants do not offer uncontroverted evidence that the Santa Monica Handbook or the MAD were ever

disseminated to Ginski. Even if they had, they do not offer uncontroverted evidence that Ginski would have reasonably understood the Santa Monica Handbook or the MAD to be an offer because Defendants cannot prove that Ginski ever read or was required to read the documents.

Defendants' motion to compel arbitration is denied.

### 1. Motion to Dismiss

Having established that Ginski cannot be compelled to arbitrate, the Court turns next to Defendants' motion to dismiss her complaint under Federal Rule 12(b)(6). A motion to dismiss tests the sufficiency of a claim, not the merits of the case. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). "To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] all well-pleaded facts as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021).

Defendants advance six different arguments for why dismissal is warranted. The Court will address them in turn.

a. **GIPA does not require that genetic information be used for "means of discrimination."**

Defendants argue that Ginski fails to state a claim under GIPA because she does not allege that any genetic information Defendants solicited was used as a "means of discrimination." (Dkt. 18 at 7-9). But as Ginski points out, the plain text of GIPA does not require allegations of discrimination. Section 25(c)(1) of GIPA provides simply that "[a]n employer . . . shall not directly or indirectly . . . solicit, request, [or] require . . . genetic information of a person or a family member of the person." 410 ILCS 513/25(c)(1). Defendants make several attempts to overcome this statutory hurtle, but none are successful.

First, Defendants point to language in GIPA and other court cases indicating that GIPA's purpose is to prevent discrimination (*See* Dkt. 18 at 7-8). For example, GIPA states that ". . . public health will be served by facilitating voluntary and confidential *nondiscriminatory* use of genetic testing information." 410 ILCS 513/5(3) (emphasis added). But Defendants do not cite to any authority suggesting that preventing discrimination is GIPA's *exclusive* purpose, as their argument requires. And in a case decided since the parties briefed the matter, a court in this district held that Section 25(c)(1) allows for claims to proceed even where no discrimination is alleged. *McKnight v. United Airlines, Inc.*, No. 23-CV-16118, 2024 WL 3426807, at *4 (N.D. Ill. July 16, 2024). ("[A]lthough GIPA was designed to prevent discrimination, it is not *just* an anti-discrimination statute.") (emphasis in original). The fact that one of GIPA's purposes is to prevent discrimination does not mean that it can serve no other purpose.

13

Defendants next argue that GIPA's requirements mirror the federal Genetic Information Nondiscrimination Act of 2008 ("GINA"), which they contend requires a plaintiff to allege some form of discrimination. (Dkt. 18 at 8). In support of their argument, Defendants cite to *Allen v. Verizon Wireless*, where the court dismissed a claim under GINA because the plaintiff failed to allege that she was denied benefits because of any genetic information. *Allen v. Verizon Wireless*, No. 3:12-cv-482 JCH, 2013 WL 2467923, at *24 (D. Conn. June 6, 2013). It is true enough that Section 25(a) of GIPA provides that "employer[s] . . . shall treat genetic testing and genetic information in such a manner that is consistent with the requirements of federal law, including but not limited to [GINA]." 410 ILCS 513/25(a). But the *Allen* court specifically held that the plaintiff failed to "state a claim for genetic discrimination" under a provision of GINA that makes it "an unlawful employment practice for an employer to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee . . . because of genetic information with respect to the employee." *Id.* at *23 (citing 42 U.S.C. § 2000ff–1(a)(1)). The *Allen* court nowhere held that GINA allows *exclusively* for discrimination-based claims, only that the plaintiff failed to state a discrimination claim under GINA. *See id.* And even if it had, Section 25(a) of GIPA's statement that employers should treat genetic information in a manner consistent with GINA does not mean that the Court can ignore the plain text of Section 25(c)(1). In short, Defendants cannot use a case interpreting a discrimination-based provision of GINA to annul a provision of GIPA that is not limited to preventing discrimination.

14

Defendants offer a final argument that the context of the statute and the language of Section 25(c) preclude the possibility that Section 25(c)(1) offers a cause of action separate from discrimination (Dkt. 32 at 7-8). In support of that, they first note that the name of the statutory section is "*Use* of genetic testing information by employers," 410 ILCS 513/25, suggesting that employers must use genetic information to be liable under GIPA. Separately, Defendants emphasize that the statute uses "and" between Section 25(c)'s subparts, and that Sections 25(c)(2), (3), and (4) all require some form of discrimination. Taken together, Defendants argue this shows that a "mere request for genetic information mentioned in Section 25(c)(1), without more, does not state a claim for which GIPA was intended to provide relief." (Dkt. 32 at 7).

Defendants' proposed construction, whereby Section 25(c)'s subparts do not provide separate causes of action, ignores the plain language of the statute. It is true that Section 25(c)(3) makes it unlawful to "limit, segregate, or classify employees in any way that would deprive [them] of employment opportunities . . . because of genetic testing." 410 ILCS 513/25(c)(3). But Section 25(c) provides that an employer "shall not do **any** of the following" acts, including "solicit, request, or require . . . genetic information of a person or a family member of the person." 410 ILCS 513/25(c)(1) (emphasis added). Defendants' strained reading of GIPA cannot overcome its plain language. Ginski is not required to allege discrimination to state a claim under Section 25(c)(1).

### b. Plaintiffs' allegations overcome GIPA's "inadvertent" exclusion.

Defendants next argue that any solicitation of genetic information was "inadvertent" and thus not actionable under GIPA. (Dkt. 18 at 9). GIPA provides that "inadvertently requesting family medical history by an employer…does not violate this Act." 410 ILCS 513/25(g). GIPA does not define "inadvertent," and Defendants rightly suggest that the Court rely on a dictionary definition to supply the word's meaning. (Dkt. 32 at 10); *Maschek v. City of Chicago*, 2015 IL App (1st) 150520, ¶ 56 (supporting reliance on dictionary definition when a statute does not define its own terms). The Court accepts the definition Defendants provide: the "plain meaning of 'inadvertent' is 'unintentional' or 'not focusing the mind on a matter: inattentive.'" (Dkt 32 at 10, citing *Inadvertent*, Merriam-Webster.com, http://merriam-webster.com/dictionary/inadvertent).

Using Defendant's definition, Ginski's allegations survive GIPA's inadvertent exception. Ginski alleges that Defendants employ hundreds of individuals in Illinois and that "[a]s a part of their hiring process, Defendants require their prospective employees to undergo a physical examination," and that such examinations "include the solicitation of information regarding the manifestation of diseases in family members of the prospective employee." (Dkt. 29, Ex. A ¶¶ 24-26). In other words, Ginski alleges that Defendants purposely seek genetic information from employees as a part of their hiring practice. The allegations do not describe conduct that is "unintentional," "inattentive," or indeed, "inadvertent."

On reply, Defendants argue that "Santa Monica did not ask for, have knowledge of, or utilize in any way the information allegedly solicited from Plaintiff.

That information, if any, was solicited by a third party." (Dkt. 32 at 11). First, at this stage of the proceedings the Court must accept the allegations in the light most favorable to Ginski. In addition, Section 25(c) of GIPA provides that it is unlawful for an "employer, employment agency, labor organization, [or] licensing agency" to "directly *or indirectly*" solicit genetic information from a prospective employee. 410 ILCS 513/25(c)(1) (emphasis added). To the extent that Defendants are suggesting a third party performed the examinations at issue, that does not appear to save them from GIPA's reach.

Accepting Ginski's well-plead allegations as true, the Court finds that Defendants' alleged solicitation of genetic information was not inadvertent.

### c. Plaintiffs sufficiently allege that Defendants solicited and obtained "genetic information" under GIPA.

Defendants next argue that the information they solicited and obtained "does not rise to the level of" genetic information as the term is defined in GIPA. (Dkt. 18 at 10-11). GIPA does not define "genetic information" itself but instead adopts HIPAA's definition. 410 ILCS 513/10 ("'Genetic information' has the same meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103."). HIPAA in turn defines "genetic information" to include "the manifestation of disease or disorder in family members of [an individual]." 45 CFR 160.103.

The parties did not cite case law interpreting the relevant provision of GIPA. Instead, they relied on cases interpreting GINA's definition of "genetic information," which like HIPAA includes "the manifestation of a disease or disorder in family members." 42 U.S.C. § 2000ff(4)(A)(iii). After the parties filed their briefs in this case,

the court in *McKnight v. United Airlines*, Inc., No. 23-CV-16118, 2024 WL 3426807, at *2-3 (N.D. Ill. July 16, 2024) (Coleman, J.) considered whether the kind of information allegedly solicited here – family history of high blood pressure, cancer, and heart disease – qualifies as genetic information under GIPA.

Like the parties here, *McKnight* relied on GINA cases to determine what kind of information qualified as the "manifestation of disease or disorder in family members." *Id*. The *McKnight* court found that courts interpreting GINA consistently define manifestation of a disease or disorder in an individual's family members to mean "family members' diseases or disorders that suggest another family member's genetic predisposition to the condition." 2024 WL 3426807 at *2 (collecting cases); *Taylor v. Union Pac. R.R. Co.,* No. 23-CV-16404, 2024 WL 3425751, at *4-5 (N.D. Ill. July 16, 2024) (Coleman, J.) (same). The Court agrees with the *McKnight* court's reasoning and adopts the same rule here.

It is for this reason that Defendants' reliance on *Poore v. Peterbilt* is unpersuasive. In *Poore*, the court dismissed a plaintiff's GINA claim after the plaintiff disclosed that his wife suffered from multiple sclerosis. *Poore v. Peterbilt of Bristol, L.L.C.*, 852 F. Supp. 2d 727, 731 (W.D. Va. 2012). Unlike the allegedly solicited information here, "[t]he fact that Poore's wife was diagnosed with multiple sclerosis has no predictive value with respect to Poore's wife's diagnosis to forecast the tendency of any other individual to contract multiple sclerosis." *Id*. Because the conditions at issue here – history of high blood pressure, cancer, diabetes, heart disease, and other medical conditions – "might suggest Plaintiffs' own predispositions

18

to contract [those conditions]," *McKnight,* 2024 WL 3426807, at *3, Ginski has adequately alleged Defendants solicited genetic information for purposes of a GIPA claim.

### d. Ginski adequately alleges that she is "aggrieved" under GIPA.

GIPA provides a right of action to "[a]ny person aggrieved by a violation" of the statute. 410 ILCS 513/40(a). Defendants argue that Ginski failed to state a claim because she does not adequately allege she was "aggrieved" by violation of GIPA. (Dkt. 18 at 11). Defendants do not argue for any specific definition of "aggrieved" but instead say again that a plaintiff must allege they were discriminated against or that Defendants "used the [genetic] information adversely." (*Id.* at 11-12) GIPA does not offer any definition of "aggrieved," so the Court must "predict how the Illinois Supreme Court would decide [this] issue." *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). The parties' briefing did not point to, and the Court has not found, any Illinois opinions that define what it means to be aggrieved by a GIPA violation. However, GIPA's "aggrieved" provision is nearly identical to BIPA's[2], and the Illinois Supreme Court's guidance on BIPA is illuminative here.

In *Rosenbach*, the Illinois Supreme Court decided "whether one qualifies as an aggrieved person . . . pursuant to [BIPA] if he or she has not alleged some actual injury or adverse effect, beyond violation of his or her rights under the statute." *Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 1. The court held BIPA does *not*

---

[2] *Compare* 740 ILCS 14/20 ("Any person aggrieved by a violation of [BIPA] shall have a right of action . . . against an offending party."), *with* 410 ILCS 513/40(a) ("Any person aggrieved by a violation of [GIPA] shall have a right of action . . . against an offending party.").

require any injury beyond a violation of statutory rights. *Id*. at ¶ 40. The court explained that "[w]hen the General Assembly has wanted" to impose such a requirement in a statutory scheme, "it has made that intention clear." *Id*. at ¶ 25. As an example, the Illinois Supreme Court pointed to the Consumer Fraud and Deceptive Business Practices Act, which explicitly provides a private right of action only for "[a]ny person ***who suffers actual damage*** as a result of a violation of this Act." *Id*; 815 ILCS 505/10a(a) (emphasis added). Conversely, and like both BIPA and GIPA, the AIDS Confidentiality Act provides for a private right of action for "[a]ny person aggrieved by a violation of this Act." 815 ILCS 305/13. Plaintiffs suing under a violation of that statute need not prove any damages beyond a violation of their statutory rights, suggesting the same result with both BIPA and GIPA. *Rosenbach*, 2019 IL 123186, ¶ 26.

The *Rosenbach* court also looked to Illinois opinions spanning more than the last century and found consistent support in their jurisprudence that a person can be "aggrieved, in the legal sense, when a legal right is invaded by the act complained of." *Id*. at ¶ 30 (citing *Glos v. People*, 102 N.E. 763, 767 (Ill. 1913)). The Court also found that the "plain and ordinary meaning" of the word "aggrieved" supported this definition. 2019 IL 123186, ¶ 32. The Court concluded that BIPA's "aggrieved" provision did not require any injury beyond a violation of a plaintiff's rights under the statute.

The Illinois Supreme Court's reasoning compels the same result here. GIPA, like BIPA and the AIDS Confidentiality Act, does not explicitly limit a private right

of action to those who suffer actual damages. Further, the word "aggrieved" itself is defined as "suffering from an infringement or denial of legal rights." *Aggrieved*, Merriam-Webster's Collegiate Dictionary 25 (11th ed. 2006). Nothing in the language of the statute or Illinois case law justifies Defendants' proposed interpretation. The only other federal courts to consider this issue likewise found that the Illinois Supreme Court would find apply *Rosenbach*'s definition of aggrieved under BIPA to GIPA. *See Taylor v. Union Pac. R.R. Co.*, No. 23-CV-16404, 2024 WL 3425751, at *2 (N.D. Ill. July 16, 2024); *Bridges v. Blackstone Grp., Inc.*, No. 21-CV-1091-DWD, 2022 WL 2643968, at *3 (S.D. Ill. July 8, 2022), *aff'd sub nom. Bridges v. Blackstone, Inc.*, 66 F.4th 687 (7th Cir. 2023).

Defendants argue that the Court should not adopt BIPA's meaning of "aggrieved" because GIPA's "narrow and specific purpose" is "to prevent employment discrimination based on genetic information." (Dkt. 18 at 11). But as discussed *supra*, it is manifestly *not* GIPA's narrow and specific purpose to prevent employment discrimination, because Section 25(c)(1) provides plaintiffs with a private right of action even where no discrimination has occurred. Indeed, the text of GIPA makes it clear that the statute is meant to "require or promote voluntary and confidential use of genetic testing information." 410 ILCS 513/5(2). Defendants do not otherwise contend with the *Rosenbach* court's analysis. Because of the clear similarities between the "aggrieved" provision in GIPA and in statutes like BIPA and the AIDS Confidentiality Act, and because of the plain meaning of the word, the Court finds that Ginski has adequately alleged she is "aggrieved" under GIPA.

### e. Ginski does not need to allege negligence, recklessness, or intent to survive a motion to dismiss.

Defendants argue that Ginski must plead facts sufficient to show that Defendants acted negligently, recklessly, or intentionally to state a claim under GIPA. Defendants again cite to case law interpreting BIPA to argue that GIPA contains such a requirement. BIPA, like GIPA, provides for different amounts of damages based on a defendant's mental state. 410 ILCS 513/40; 740 ILCS 14/20. But numerous courts in this district, including this Court, have held that allegations of mental state are not required to state a claim under BIPA. *See, e.g., Smith v. Signature Sys., Inc.*, No. 2021-cv-02025, 2022 WL 595707, at *5 (N.D. Ill. Feb. 28, 2022); *Bradenberg v. Meridian Senior Living, LLC*, 564, F. Supp. 3d 627, 634-35 (C.D. Ill. 2021); *Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1092 (N.D. Ill. 2019) And the *Taylor* court has already applied the same rule to GIPA. *Taylor*, 2024 WL 3425751, at *9. *Taylor*, like other opinions interpreting BIPA, reasoned that the relevant provision of GIPA provide for remedies for a plaintiff who prevails on their GIPA claim, rather than laying out elements essential to state a GIPA claim. *Id.* The Court adopts the same reasoning here and holds that Ginski was not required to allege any mental state to state a claim under GIPA.

### f. Ginski's claim is not time-barred.

Finally, Defendants argue that Ginski's GIPA claim is time-barred. GIPA does not provide a statute of limitations, so the Court must "determin[e] which limitations period [under Illinois law] controls [GIPA] claims," and "must focus [its] inquiry on the nature of the liability." *Tims v. Black Horse Carriers, Inc.*, 2023 IL 127801, ¶ 18.

Defendants argue that 735 ILCS 5/13-201, which provides for a one-year statute of limitations for claims relating to defamation or a "publication of matter violating the right of privacy," should govern GIPA claims. In the alternative, they argue 735 ILCS 5/13-202, which provides for a two-year limitations period to personal injury claims, should apply. Ginski believes that the five-year limitations period embodied in 735 ILCS 5/13-205 that applies to "all civil actions not otherwise provided for" by the Illinois Code of Civil Procedure should apply here. The Illinois Supreme Court found that the five-year limitation applied to BIPA claims, but it has not yet ruled on the issue in the GIPA context. *Tims*, 2023 IL 127801, ¶ 24. Again, the *Taylor* court's analysis is instructive.

*Taylor*, drawing on the Illinois Supreme Court's analysis of BIPA in *Tims*, rejected the argument that Section 201 should apply because the prohibitions contained in GIPA Section 25(c)(1) – "solicit[ing], request[ing], require[ing], or purchas[ing] . . . genetic information" – are fully unrelated to any kind of publication of private information or defamation. 2024 WL 3425751, at *8. The court reasoned that these terms are for more similar to the language of BIPA's Section 15(b), which prevents entities from "collect[ing], captur[ing], purchas[ing], receiv[ing] through trade, or otherwise obtain[ing]" a person's biometric data. *Id.* (citing 740 ILCS 14/15(b)). Section 25(c)(2) – (4) of GIPA likewise do not prohibit activity sounding in either defamation or publication of private information. For the same reasons as the *Taylor* and *Tims* courts, this Court finds that 735 ILCS 5/13-201's one-year statute of limitations does not apply to GIPA claims.

The two-year limitations period prescribed in Section 202 of the Illinois Code of Civil Procedure may be a closer fit. The *Tims* court did not address this argument with respect to BIPA, but its assessment of Section 201 nonetheless offers clarity. BIPA provides five separate causes of action for plaintiffs. 740 ILCS 14/15. *Tims* noted that three of these subsections "contain no words that could be defined as involving publication," while two of them "argu[ably] . . . involve[e] publication." 2023 IL 127801, ¶¶ 30, 32. As a result, Section 201's one-year limitation "could be applied" to those sections. *Id*. at ¶ 32. However, the court nonetheless applied the five-year limitations period to the entire statute to effectuate the "the legislature's inten[t] that a uniform and harmonious system of law apply." *Id*. at ¶ 34 (quoting *Sundance Homes, Inc. v. Cnty. of DuPage*, 746 N.E.2d 254, 270 (Ill. 2001).

Likewise, although Defendants never actually make the argument, Sections 25(c)(2) and (3) of GIPA arguably involve some kind of personal injury. But as the Court has discussed at length, Section 25(c)(1) does not require any injury or adverse effect beyond a violation of statutory rights. "GIPA, like BIPA, 'is not a penal statute, even if it provides for statutory damages.'" *Taylor*, 2024 WL 3425751, at *8 (citing *Burlinski v. Top Golf USA Inc.*, No. 19-CV-06700, 2020 WL 5253150, at *7 (N.D. Ill. Sept. 3, 2020)). To apply the two-year statute of limitations to GIPA claims alleging personal injury but not to GIPA claims brought under Section 25(c)(1) would be to create a varied and disharmonious system of law. Thus, consistent with the Illinois Supreme Court's analysis of BIPA, this Court declines to adopt 735 ILCS 5/13-202's more stringent two-year statute of limitations and instead holds that 735 ILCS 5/13-

205's five-year limitation period applies. *See Paradies v. Alden Estates-Courts of Huntley, Inc.,* 2023-CH-01311 (Nov. 8, 2023) (applying five-year statute of limitations to GIPA claim). Because Defendants allegedly solicited the information at issue form Ginski less than five years ago, Ginksi's GIPA claim is not time-barred.

### <u>CONCLUSION</u>

For these reasons, the Court denies Defendants' Motion to compel arbitration, or in the alternative, dismiss. (Dkt. 17).

E N T E R:

Dated: September 23, 2024

_____
MARY M. ROWLAND
United States District Judge

25